## In re LANSING'S WILL.

(*Supreme Court, General Term, Third Department. July 2, 1888.*)

WILLS—VALIDITY—VOLUNTARY EXECUTION—PRESUMPTION.

 Proof that the will of testatrix, who was rather illiterate, not accustomed to reading, and sick at the time, was written from instructions furnished by a confidential friend and adviser, whose family were the principal legatees, and that she requested it read at the time of executing it, which was refused, her adviser assuring her it was "all right," and in the absence of proof that testatrix gave the instructions from which the will was written, is sufficient to authorize an issue of fact to determine its validity.[1]

Appeal from surrogates' court, Schenectady county.

In the matter of the probate of the will of Sarah Lansing.

Argued before LEARNED, P. J., and LANDON and INGALLS, JJ.

*A. P. Strong* and *Edward D. Cutler*, for appellants. *Walter L. Sanders*, for respondents.

LEARNED, P. J. It is our duty to examine the case *de novo;* and unless we are satisfied that the probate should be granted, and have no doubt on that point, we should reverse the decree, and order issues to be tried. *Howlard* v. *Taylor*, 53 N. Y. 627. The decedent and her sister Maria Lansing were unmarried women, who lived together on a farm. At the date of the alleged will, she was about 63; the sister a little younger. They lived in a penurious manner, somewhat careless as to neatness. They took no newspapers and

[1] As to the presumption of undue influence when a will is made in favor of a confidential adviser, etc., see Thompson v. Hawks, 14 Fed. Rep. 902, and note. As to what amounts to undue influence, see In re Dunham's Will, 1 N. Y. Supp. 120, and note; In re Buckley's Will, *ante*, 24.

read no books; but this was not from inability to read. Together they had at her death, in 1887, about $12,000 in personal property. How much at the date of the will does not appear. At the date of her death, she had two brothers, two sisters, three children of a deceased sister, and three children of a deceased brother, her next of kin. One of these sisters was wife of Duncan McDonald. The will gives a life-estate to her sister Maria, $750 each to two daughters of Mrs. McDonald, $250 to another sister, (deceased before the testatrix,) $100 to a nephew, and all the rest to Mrs. McDonald. There is no evidence to show any want of testamentary capacity. There is some evidence (which is disputed) that testatrix was in bed when she made this will; but she does not appear to have been dangerously sick at the time, and lived seven years after. The position of the contestants is that Duncan McDonald procured the will to be drawn; that his family were largely interested in it, and received the principal benefit therefrom; that he stood in a confidential relation to the testatrix, and therefore the ordinary proof of due execution is not enough; and that further proof is needed, which they say was not given. It is undoubted that McDonald was in a confidential relation to testatrix and her sister Maria. He transacted their business. The will was drawn under the following circumstances: McDonald called on Judge Sanders, of Schenectady, his own counsel, and requested him to go and draw and have executed the wills of these sisters. Judge Sanders, in substance, said it was not necessary for him to go; that McDonald knew about the execution of wills. The next day McDonald came with instructions in his own handwriting, and Judge Sanders caused the wills to be drawn in his office. They were alike in terms. McDonald took them, and went to the residence of these sisters in Watervliet. Peter Pearse, who lived not far, was called there to be a witness. The other was Dr. Switz, since deceased. Pearse says that Maria, the sister, Dr. Switz, and McDonald were present. He remembers no one else. Dr. Switz signed as a witness, and Pearse signed. The deceased signed, lying in bed, as he testifies. In reply to an inquiry by McDonald, she said it was her last will and testament. He testifies that before she signed she asked McDonald to read the will, and he said: "It is all right, Aunt Sally." He says this request was made twice, and the same reply was made each time, and that the will was not read in his presence. There is a conflict on this point. Another witness says that it was Maria who was sick, and that the deceased was about the house. Abbie Pearse, a niece of testatrix, says that she heard the testatrix say: "McDonald, read the will;" and he said: "It is all right." The witness, however, does not testify positively that Maria was in bed, and she also testifies that the testatrix was sick enough to be confined to her bed, but that she was around all the time. She says that this request was made as McDonald was going out of the room, and she thinks after Peter Pearse had gone. Peter Pearse, however, positively states that this request was made by the person in the bed, and that that person was Sarah Lansing, and that he thought it strange that McDonald did not read the will to her. It is claimed by the proponents that these requests of the decedent referred to the will of Maria Lansing, and what testatrix desired was to see that her sister had executed a will in similar terms to her own. But it is not proved that any will of Maria was then executed. The witness Pearse thinks he witnessed no other will, and there is no proof given that Maria did execute a will on that day. Pearse was called there for a definite purpose. It was his duty to see and remember what took place, and he gives a reason for his remembering this request. It seems to us, therefore, that he is more likely to be correct than the witness Abbie, when he states that the decedent was in bed, and that she made these two requests prior to the signing of the will.

Ordinarily, the formal execution of a will affords presumptive evidence that the testator knows its contents. But, of course, the strength of this presumption varies with circumstances; and where a woman not accustomed to

much reading, rather illiterate, and at the time ill in bed, requests that a will be read to her, and the request is not granted, then the presumption above mentioned is certainly greatly weakened. This is especially true where the will has been prepared by the direction of her confidential agent on instructions written by himself, and where there is an absence of proof that she gave any instructions as to the contents. We do not think it necessary to cite many cases in regard to the law where the person who prepares a will is himself a legatee. The provision of the civil law (Dig. 48, tit. 10, L., 15) which declared a person to be guilty of a crime who, in writing the will of another, *legatum sibi sua mamu scripseret*, is not in force with us. The attorney who draws a will may, without crime, insert, at the wish of the testator, a legacy to himself, and the legacy will be valid. Such an act is only a circumstance to be considered, and to be allowed, in each case, such weight as the circumstances justify. 1 Williams, Ex'rs, 112, and note. If the testator is in full possession of his faculties, abundantly able to do business, and accustomed thereto, it is not probable that he will sign a will without reading and understanding it; and, if his will contains a legacy to the attorney who drew the will, then such was probably the wish of the testator. On the other hand, if the testatrix be unaccustomed to business, somewhat illiterate, accustomed to depend on the person who prepared or caused to be prepared the will; if its provisions are largely for the benefit of himself and his family; if there is no evidence that she knew the contents; and especially if there is evidence tending to show that she desired to have the will read, and that this person, on whom she relied, did not comply with her request, but put her off with an assurance that it was all right,—then, under such circumstances, there is not that clear proof that the instrument expresses her wishes which would exist in the other case. It is not for us, on this appeal, to decide whether the instrument should be admitted to probate. We are only to see whether it is so clearly the will of the testatrix that the decree should be affirmed. We do not even decide that the request of the testatrix to have the will read referred to her own will. The learned surrogate found that the request referred to the will of Maria. As McDonald is dead, there is no testimony to show that the instructions from which Judge Sanders prepared the will were dictated by the decedent, and thus we are left to the transaction which took place at the time of the execution of the will. Under all the circumstances, we think the decree should be reversed, and that the questions of fact should be tried at a circuit to be held in Schenectady county; costs of appeal to abide the final order of the surrogate; order and issues to be settled by Judge LANDON.

LANDON and INGALLS, JJ., concur.